Good morning. Good morning, Your Honor. May it please the Court and Counsel, Michael Rosenberger on behalf of Zango, I'd like to reserve three minutes. If every anti-spyware or security software did what we allege that Kaspersky does in this case, Zango would be out of business within 60 days. Just undeniable. A company incorporated in the state of Washington with a couple hundred employees would be issuing pink slips to all of its employees because no one would be able to access Zango content. Under the district court's order, that result would be completely unreviewable because of this good faith standard which the court read out of the statute. Well, what would you read into the statute if the statute has to be read to include the kind of blocking service that Kaspersky was providing? I'm sorry, Your Honor. Could you explain? Well, what you say if there's no good faith in the statute, if A doesn't translate down to B, in other words. It does, we say. I know you do. Oh. But you're saying what you're arguing for is, okay, they qualify as a provider, but what you want is some limitation on the kind of activity? Not at all, Your Honor. We believe that you don't even get to the question. Let's assume that they do qualify. That they're either a provider or a user of an interactive computer service. Exactly. Because you went off on the district court giving pink slips because there's no good faith. So I want to pick up on that. If they're under Part B, there's no good faith explicitly in it, so what would you read into it to address your concern that these kinds of blocking services can't act maliciously or outside the bounds of the intent of the statute? Okay. Just, I'll answer your question in one second, just as a predicate to that. I don't want to say that the district court was only wrong because of the good faith issue. I understand you to be saying that. Okay. Well, the answer is to imply a good faith test into Subsection B under these circumstances, a position that Kaspersky's own amici agreed with. Not our amici. Their amici said that. They represent the anti-spyware coalition and many others, and they agree with that, too. And the reason that's appropriate is it's inherent in the structure of the Section 230 immunity. Subsection A presumes that the defendant or the person whose conduct is being challenged is the actor. Because they're the actor, they're the ones who are limiting content. It's their behavior that is subject to a good faith test. Subsection B really assumes that the Interactive Computer Service, the ICS, has given to end users the tools to make their own determination. That's why, I think, under Subsection B, there wasn't an express good faith component because the court assumed that somebody else is making that content determination, not the ICS. Under your hypothetical, if you assume Kaspersky were an ICS position, of course we disagree with, they are still the actor. They're the ones who are making that determination over the wishes of the end user, and therefore their conduct should be judged in the same way as any other conduct under Subsection A, and a good faith criterion should be read into it. And the problem with not doing it is also illustrated by the Pelorium v. Jarrett case, which, of course, Kaspersky has cited. It's an unpublished decision of the California Appellate Division. We believe it's of no precedential value, but they have cited it and we need to address it. The problem with the absence of a good faith component under Subsection B is really illustrated by that case. Jarrett, apparently a sole proprietorship, creates a filter which he puts up on his website. It allows people to try to determine whether an email they're receiving is coming from a, quote, open relay server, open relay servers often being a source of spam. Ostensibly a good tool, problem in this case is that it swept within it somebody who wasn't doing anything wrong, just a legitimate business, and they were now having an inability to communicate with their customers because email that they sent out was being blocked. Now here's where the good faith problem comes in. The court read it out of the statute, said we're not going to test Jarrett's good faith, but look at the facts. When the company calls Jarrett, what does Jarrett do? And I wouldn't usually use vulgarity in the courtroom, but it's relevant to the good faith issue and it's right in the court's opinion.  Now, what if this was not one company that was swept within it, but 150 or 250? So some guy sitting in his garage in Sunnyvale or in Redmond has the ability to put up a filtering tool onto a website he operates and he can bring 250 businesses to their knees with no inquiry into his good faith? We think not. So clearly, there's got to be an implied good faith test in this case, and if so, clearly we have created a sufficient factual record. Now how would that work? Let's suppose that instead of your California case, that you have a legitimate blocking system that happens in their judgment or to sweep or to block what they consider to be spam and it turns out that it's not really spam as in your case that you're talking about. That they're entirely legitimate, but they happen to pick up one or two others. So then the lawsuit proceeds as what? You as the affected block party can sue them because they blocked a legitimate outside parameter of blocking entity and their defense would be, you know, we acted in good faith. We just made a mistake, so that's the immunity that they get. Well, it would obviously be a question for the trier of fact to determine whether or not they were operating in good faith. When somebody responds with an expletive, doesn't want to concede. Well, I don't. Okay, I understand. Yeah. I want to address the broader question, get off good faith, and discuss the question of whether or not Kaspersky is even an interactive service provider. We know what the purpose of the immunity is. It was to reverse stratton Oakmont. Why do we know that? Because the conference report told us that. We know who the intended beneficiaries of the immunity are. Again, the conference report told us. The conference report may say a lot of things, but the statute on its face is pretty clear. Not at all, Your Honor.  It's awfully clear in defining what an interactive computer service is as an access software provider. Not at all, Your Honor. There's a second phrase, but there's, yes, it is an access software provider, but an access software provider that enables multiple users to access a server. And I would go, I mean, let's talk about your precedence in this circuit. In the Batzel case, a question had to do with this immunity. No, but it did address the threshold question of whether or not the website operator was a provider or user of an interactive computer service. That threshold question was explicitly addressed. And the court there said that, number one, we're going to punt on the question of whether it's a provider. We are going to hold, however, that it's a user. Because it had a website, it was utilizing that connectivity that providers, internet service providers, provide. That's perfectly consistent with what the conference report says. The conference report said, we intend to overrule Stratton Oakmont v. Prodigy and any other similar decisions which have treated such providers and users as publishers. That's the intent. Yeah, but if Congress had seriously intended to do that, all it had to do was have a content provider definition. I would say, well, it actually does have a content provider. It doesn't. I mean, where is there a content provider qualifier in the definition of interactive computer service or in the definition of access software provider? Access software provider is defined as one who provides or enables access by multiple users to a server in order to filter, screen, allow, or disallow content. Sure. And that's what's going on, isn't it? No, it's not what's going on. They are an access software provider. I don't deny that. But for that, I mean, under the breadth of this definition. All right. Well, then if they are, then why isn't that? Why? Because they don't provide or enable access by multiple users to a computer server within the meaning that Congress intended when it created this definition. And that is because? Number one, the conference report is. No, no, no, no, no, no. Why don't they do that? Why don't they do that? Yes. Oh, it's just simply that, well, our position is simply that when you have a software application, that all it does, without any volitional intent upon the part of the user, it simply communicates electronically with its. It doesn't have to. I mean, it's automatic, but the statute doesn't have a qualifier for automatic updates versus manual updates either. Well, the fact of the matter is, Your Honor, every piece of software nowadays can be updated. Any application you want to buy can update itself over the computer. Sure. If that's the case, then every single piece of software is an interactive computer service. Well, but not for purposes of the statute, because it has to be for purposes of filtering, screening, allowing or disallowing content. Right. It has to be focused on giving people choices of what to exclude. Well, and that's the only context in which this statute is true for. Well, that's true. It has to meet the other statutory components. But again, I mean, if it does have any filtering component, every single piece of software that had any component of that would be an interactive computer service. The thing is, too, though, however, Section 230D, I think, impliedly distinguishes between ICS's interactive computer services and the tools such as Kaspersky. I mean, it says that when an interactive computer service signs someone up, Section 230D says, you, ICS, need to let the interactive, excuse me, let the end user know of the availability of these tools. It did not equate the two. It didn't say the tools themselves are interactive computer services. The other thing I would point out is just to reference footnote 28 of this Court's decision in Fair Housing Council, which I know Your Honor and Your Honor are very familiar with as having been on the en banc panel. But in footnote 28, the majority opinion says, with regard to the Batzel decision, that we have our doubts about this very decision that it made, that it was an interactive, excuse me, a user of an interactive computer service. I don't think you're going to get a lot of mileage out of Batzel or roommates because I can tell you as a judge sitting on roommates, this issue I have in this case has preoccupied me for several weeks now and I don't find any guidance from my experience in roommates. Now, maybe other judges do, but this is a very serious problem. I don't mean to suggest otherwise, but quite frankly, I think we're in new territory on this aspect of the statute. I agree. And again, I can only then reference the SPY Act, finally. Congress in the, or excuse me, the House of Representatives, it's not law yet, it was passed by the House of Representatives, but it has not been passed by the Senate. In the SPY Act, the House saw fit to create a limited immunity, more limited than that which they are claiming here. It saw fit to create a limited immunity for anti-Spyware companies for exactly the kinds of behavior that is questioned here. If the district court were correct, the House would not have needed to create that immunity because Section 23. I mean, first of all, it's an argument that wasn't made in the district court and the act is just what the House has done. I mean, I don't think that's going to get anywhere. Well, it's a question of whether Your Honor finds that a persuasive argument or not. Okay. You're about out of time. Thank you, Your Honor. Good morning. May it please the Court and counsel. I'm Eric Belt. I'm from Bromberg and Sunstein in Boston. Happy to be in Seattle today. I represent the defendant, Appellee Kaspersky Lab. With me today is Bruce Johnson from the Davis Wright Tremaine firm here in Seattle. Does he get to go to Boston in reciprocal? So he experiences your well-being. We have some nice restaurants out there. I'll take him when he's out here. Your Honors, this case is about the lock on the door. It's about an alarm on the window. A lock or an alarm gives the user... So that isn't a helpful analogy because in the internet context, the lock on the door and the alarm, you can look and see and feel and know as a homeowner what those are. But my concern about this case, so I'm saying it now so you can, in your remarks, focus, address somebody who uses the computer, who is not technically proficient, but uses it a lot, who has, in my case, I personally experienced McAfee blocking my access to Microsoft browser, not intentionally as far as I know, but it took me two hours working with Verizon, which provides my access, to figure out that McAfee gone haywire for some reason was blocking my access to the browser that I wanted. Now, it manifested itself because I couldn't get access. I knew I wasn't getting access. But Symantec, so I took McAfee off, and we have Symantec. OK, so Symantec once a week comes and does these little gyrations, and I have no idea what it's checking or blocking or whatever. So my concern is the lock that you put into your computer, thinking it's there to enable you to get parental controls. That's what you put it on for. Has embedded in it functions which your company says in its judgment, in your decision whether something is harassing or whatever, you can decide under this statute, you can decide whether to block it or not. And how am I, as the innocent, technically Luddite type of computer user, going to know what you have decided to block? What if some sources start not appearing on my computer? Not because I chose not to see them, but because you decided you didn't want them to appear. And that you're doing that because you have a very good reason. You get money from blocking certain internet sources that are trying to access me. And in your judgment, without my knowledge, I have no way of knowing that you're doing it. And that's the power that you have. That person who's blocked doesn't have any recourse by your reading of the statute. Okay, so I have two or three responses to that, Your Honor. The first one is, I think you mentioned that you were dissatisfied with McAfee and you went and blocked another internet security software. Well, the court told me to do it. Okay, well, I think... Wasn't smart enough to do it. I think that's part of the answer here, Your Honor, which is, if you don't like how strong or weak your... I was giving you a gross situation, which I made careful to point out. I recognize what I'm worried about is when I don't recognize it. When I don't realize that what I thought was a limited screen has actually, for its own purposes, is screening out a lot of stuff I would like to have, which is their allegation. Yes, that is. And so what I'm saying is, so if that were the case, and you are dissatisfied as a user of Kaspersky because you think it's blocking out too much... How will I know? How will I know? Well, there's an easy way to know, Your Honor, which is that when the Kaspersky software detects something, you get a screen. And you'll see on page 13 of our brief, we had a nice colored version of a screenshot here. What's happening here is, here the computer user was trying to download Zango. It downloads, and then a screen pops up and says, allow or deny, and it says exactly what it is. So the user is given the choice, the control, to figure out what it is. Now, the second part, another response to your question is, if you... But if it doesn't, your argument is that you're under this statute. You're telling us what you do, but under this statute, you don't have to have those pop-ups. You're just saying that because the statute itself says, in the opinion of the user or the provider, is harassing, obscene, all of these things. That is right. So what you're trying to say, are you willing to say that there's an implicit requirement in subsection B, the hypothetical that you put in your brief, that that's an exception? I'm not willing to say that, Your Honor. The good faith language is not in section 230C2B. It's in A, and I think the law is clear that when you're looking at the plain language of a statute, you can't read in a requirement that's in one portion of the statute into a second portion of the statute. But all I'm saying is, even if the court were to read a good faith requirement into the statute, and I think it's harder to read something into a statute, then I think what the facts of this case showed and what the allegation showed is that, in any event, we were acting in good faith. But to answer more directly your question, Your Honor, if you don't like the lock or the alarm analogy, another appropriate analogy might be hiring a doorman. You are entrusting a little bit to the judgment of the doorman, or let's say a bouncer at a nightclub, whom to let in. You are making, you are delegating that authority. The internet is so fast, and there's so much... Yeah, but if that doorman starts blocking blacks from coming up to my apartment, and I don't know that. Yeah. Okay, black delivery men. You fire them. If I know what's happening. If I know what's happening. You know, the policy of this statute says it is the policy of the United States, subsection 3, to encourage the development of technologies which maximize user control. Okay. Right. Kapersky is not a user. It is a provider. It is user control, and that's what concerns me here. If we read you into the statute, which is hardly plain, but let's suppose you prevail on that, then that puts you under an absolute immunity, when the user, which is their allegation, doesn't know how broadly you are blocking access and maybe you give them notice. But there's nothing in the statute, under your reading, that says the ultimate user, the person who this statute was clearly intended for, is in control of what is being blocked. It's censorship, it's open to censorship, it's open to anti-competitive behavior. No, Your Honor, the... That is the concern I have. Right. The control, Your Honor, was to, the election to put the software on your computer to begin with. That is the, I believe that is the choice. Zango talks about this as choice. We want to have, the user wants to have the choice to download Zango. How did the software, Kaspersky, or whether it's McAfee or Symantec or one of the other brands, get on your computer to begin with is because you went out, you read reviews, you said, here is what this software does. And the software says, we go out and are constantly looking at all of the malicious software that's out there. And it's updating all the time. So you are entrusting us with our judgment that we are going to protect you. This is the sentinel to the portal of the internet. And if you don't like the way they are protecting you because you feel like you can't get, log on to Zango. And don't forget, when you are logging on to a website, it's not as if you go away from your computer and you are upstairs and the doorman is downstairs. You are there trying to get on to a computer system. So every time that it blocks something, it's going to give you a message. This is being blocked. So that is giving you user control. It comes up with that message. Then what information do I have about the person being blocked? About the entity being blocked? You were choosing to go on to that website to begin with, let's say, maybe. Or maybe you clicked on a pop-up ad or something. Clicked on a pop-up. Yeah, and that's one of the things that will be alerted. Yeah, we get those little pop-ups saying your computer might access it. Do you want to authorize this this time? Or do you want to authorize it forever? Exactly right. So there's your choice. There is your user control. It's not as if you leave the computer running to go do things. Not that much of a letter. The argument here in part is they get the message, but for some reason they're not able to unblock and get to Zango. Yes, well, I don't. Again, I think that the statute is still going to cover that sort of behavior. And what's more, if you... You don't allow them to get back onto Zango. No, I think at most that's saying there's a defect in the software. So you go out and get another software. But it's not bad faith, Your Honor. In fact, I think Judge Kunauer was very clear to say there is no allegation of bad faith here. There is no facts that are alleged here that would amount to bad faith. But your argument, though, proceeds from the assumption you have to have. You can do it in bad faith. There's no good faith requirement. You can be malicious. You can be anti-competitive because you're under B, and there is no. So whatever you decide is up to you. Let me maybe correct this. Excuse me? How do you answer that? Yeah, I'll tell you how you answer that. The software itself, Your Honor, it's not making judgments like we don't like Zango. To me, that would be something like bad faith. So you're saying that, but you're asking us to interpret a statute that's going to now govern every filtering device, at least in this circuit. And there are lots of people, as you know, because that's why you're in business, who like to use the internet maliciously. Yes. They're trying to, in a harassing manner. Yes, and let me come at it a slightly different way, Your Honor. If you were to find that the statute does not read on Kaspersky and its software, I think you're going to have just the opposite problem, which is that, and this was something that was from the roommates.com case. There, I think it was Judge Kaczynski that wrote, we don't want a situation where we're going to have death by 10,000 duck bites so that every House is passing the spyware bill. That's what they're suggesting. I don't think the spyware is relevant here, Your Honor, only to the extent that they both express the same policy, which is we don't like adware. That's the draft legislation. The Spyware Act is saying we want blocking technologies out there. We don't want adware. But I should say that the Spyware Act is addressing something else. That is about FTC enforcement. That is not about private causes of action. Our statute, the Communications Decency Act, is about private conduct. In any event, I don't think that a statute that's been around for 12 years should be trumped by pending legislation that hasn't even been passed yet. I was just suggesting if you don't fit in, then maybe Congress needs to put you in. Pursuing, one argument is made is about this update. You rely on the automatic updates. Yes. The internet updates to bring you in, because you do have to provide the critical phrase is enables computer access by multiple users to a computer server. You're relying on the automatic update. Right. What if the updates are like Quicken, for example? You can install Quicken, and then if you want to update to the next Quicken, you can get it. You can either upload it, or you can do it by CD. Let's suppose Quicken only provides updates by CD, or whatever the blocking mechanism is. Yes. Install it by CD, and the only way you can update it is by CD. They wouldn't be protected under this act. Yeah, but Quicken isn't blocking or filtering. I understand. I was just saying, using that as an example of one that gives you the option. What I'm asking is, let's suppose that the filtering system  The only way you can update is by CD. Well, I think That it would not be part of the statute. I don't think that it would, Your Honor. I think that the plain language doesn't require that, and I think I know why. When you go back and look at the legislative records, Your Honors, Senator Feingold had some interesting remarks. He's, when Senator Feingold is talking about the draft legislation back in 95 and 96, Senator Feingold asked to be read into the record an article, this is a Wall Street Journal article, about a computer product called SurfWatch. And I think SurfWatch is one of the products that our amici talk about, too. And the way that product worked, and the way that blocking software at the time worked, was that it would go out, in those days over a modem, now it would be over the internet, and get updates. And the reason for that is the internet, you know, these codes are coming out all the time, these viruses and malware that is blocked, that is meant to steal your identities and so forth. And it's sort of an arms race. So you do need to have consistent, constant updating. And that's exactly the way that the Kaspersky software works, is that the Kaspersky people are monitoring and looking for new codes and programming into your systems to get the updates so that you can keep up with that. I'm not sure how that answered my question. I said, they don't update over the internet. They're not providing anybody access to multiply computers. They're just sending you a CD. He said that wasn't, if I heard you correctly, he said that was not covered by the end. Yeah, oh yeah, absolutely. But I didn't understand why you went off on Feingold. Okay, fine. Oh, well, I think that was just to illustrate why that part of the statute may be in there, is because that's the kind of software architecture we're looking at. No, I understand. Yes. I understand that aspect. Okay, fine. Any other questions up here? No. Any other questions? No. All right. Your time has expired. Thank you for your argument. The internet, I'll Google it and get to Wikipedia. Okay, Mr. Rosenberger, you're out of time, except we took another minute or so with him. So if you want to take a minute, please do. Just two brief things. In regard to counsel's argument, the analogy to the doorman saying, in essence, if you don't like conspiracy, you could get somebody else's spyware. Of course, that's no answer here, because under the immunity, they're claiming all the other spyware companies can do the same thing, and therefore, Zango is disabled across the board. The only other second point I'd make is that we believe that there was ample factual evidence before the trial court such that if this court does import a good faith test and apply it to Kaspersky's conduct, that a fact question that defeated summary judgment was present. It was based upon the fact that we know that their competitors, the market leaders, don't do what they do. We alleged and presented evidence to an affidavit, excuse me, a declaration, that they did not even do the same thing that they do to Zango, to one of Zango's competitors. We know that they ignored our inquiries, our pleas after we raised the issue. And fourth, that they have an incentive to exaggerate threats. There's a technical term in the industry. They call it scareware. And so even though we had not even commenced discovery, we hadn't even had our Rule 26 conference, we presented evidence that would defeat or at least raise an inference of bad faith. Thank you. Thank you for your argument, both of you. The matter just argued will be submitted.
judges: Fletcher, Rymer, Fisher